**Elliot DUBOWSKI, Plaintiff,**

v.

**DOMINION BANKSHARES CORPORATION; Warner N. Dalhouse; David L. Caudill; Donald M. Kinzer; Joseph L. Malone; and Rodney W. Rowan Defendants.**

**Raymond SCHER, Plaintiff,**

v.

**DOMINION BANKSHARES CORPORATION; Warner N. Dalhouse; David L. Caudill; Donald M. Kinzer; Joseph L. Malone; and Rodney W. Rowan, Defendants.**

**Civ.A. Nos. 90–0614, 90–0647.**

United States District Court,
W.D. Virginia,
Roanoke Division.

March 15, 1991.

Arthur P. Strickland, Roanoke, Va., Leonard Barrack, Samuel R. Simon, Philadelphia, Pa., Richard D. Greenfield, Francis J. Farina, Haverford, Pa., for plaintiff.

William B. Poff, Douglas W. Densmore, Kevin P. Oddo, Woods, Rogers & Hazlegrove, Roanoke, Va., for defendants.

## OPINION

TURK, Chief Judge.

## BACKGROUND

October 19, 1990, Elliot Dubowski, a shareholder of Dominion Bankshares Cor-

poration[1] (Dominion Bank or Bank) filed a complaint against Dominion Bank and several Bank directors alleging claims arising under section 10(b) of the Exchange Act of 1934[2] (the Exchange Act), Rule 10b–5[3] of the Securities and Exchange Commission promulgated thereunder, and section 20 of the Exchange Act.[4] Raymond Scher, also a Dominion shareholder, filed a similar claim on October 30, 1990. Per Order of this Court entered December 27, 1990, the two cases were consolidated pursuant to Rule 42(a), Federal Rules of Civil Procedure. The Court has jurisdiction over this claim pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78 *et seq.*

This case is presently before the Court on defendants' motion to dismiss. The parties have argued the motion and submitted supporting memoranda. The motion is ripe for decision.

■ In support of their claims under section 10 of the Exchange Act, plaintiffs allege the individual defendants[5] issued various optimistic statements for which there was no basis, thereby misrepresenting and concealing Dominion's deteriorating financial condition. In particular, plaintiffs claim defendants, in their roles as Bank officials, misrepresented and concealed the quality of Dominion's loan portfolio; misrepresented and concealed the likelihood of significant increases in non-performing assets, charge-offs, and loss reserves; failed to set appropriate loan loss reserve levels though the Bank claimed the loan loss allowances were reviewed quarterly; and failed to charge off assets on which, in light of the facts known or available to

1. Dominion Bankshares Corporation is a bank holding company incorporated under the laws of Virginia. As of December 31, 1989, the Corporation operated ten banks and six primary bank-related affiliates.

2. 15 U.S.C. § 78j(b) (1988).

3. 17 C.F.R. § 240.10b–5 (1988).

4. 15 U.S.C. § 78t(a) (1988).

5. At all times relevant to this suit: Defendant Dalhouse was Chairman, Chief Executive Officer, and a director of Dominion; Caudill was President, Chief Operating Officer, and a director of Dominion; Kinzer was Executive Vice President and Chief Financial Officer of Dominion; Malone was Corporate Executive Officer of Dominion, Chairman and Chief Executive Officer of Dominion Bank of Northern Virginia, N.A., and President and Chief Executive Officer of Dominion Bank of Washington, N.A., Washington, D.C.; Rowan was Senior Vice President and Controller of Dominion.

them during the Class Period, substantial losses were virtually certain. According to plaintiffs, defendants misled them both by making false statements concerning the Bank's status and in failing to reveal information needed to place in perspective defendants' positive statements.

Plaintiffs claim they relied on public statements published by defendants in purchasing Dominion shares between January 18, 1989 and July 1990. They further assert that at the time they purchased the stock the price was inflated because the Corporation's earnings, assets, and net worth were materially overstated due in part to inadequate provisions for loan loss reserves.[6] Plaintiffs argue that, had they received truthful information disclosing Dominion's true financial state, they would not have purchased the stock at the inflated price. Plaintiffs were harmed when defendants finally disclosed the true financial condition of the Bank and the stock prices fell significantly.[7]

## RULE 9(b) ANALYSIS

■ Defendants motion the Court to dismiss plaintiffs' claims under Rule 9(b) for failure to claim fraud with particularity. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). A plaintiff must claim fraud with particularity for several reasons: first, to provide defendant notice of the charges against him; second, to protect defendant from harm to his reputation or goodwill; finally, to prevent strike suits. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989).

To support their claims of fraud, plaintiffs quote from press releases and group-published 10–K, 10–Q, and 8–K Forms filed with the SEC. For example, plaintiffs quote defendants' group-published 1988 Annual Report as stating that "[o]n December 31, 1988, loans, net of unearned income, totaled $6.4 billion, a 12.6% rise from the end of 1987. Loan growth was relatively *well balanced* with commercial

and construction loans advancing 11.9% and mortgage and consumer loans increasing 13.6%." (Emphasis added). Plaintiffs further quote defendants as stating that the loan loss reserve "reflects an amount which in management's judgment is adequate to provide for potential loan losses." Plaintiffs also point to defendants' representation that "Dominion maintains a very diverse loan portfolio in which there is no industry or geographic concentrations. The only significant concentration is confined to real estate construction lending. . . ." Thus, most statements which plaintiffs cite report the Bank is in healthy financial condition with a favorable loan portfolio and adequate loan loss reserves.

Plaintiffs contrast these statements with materials published in 1990 (particularly May, 1990) which reveal, among other things, a net loss for the first quarter of 1990. In these statements, defendants attribute the losses to increased loan loss provisions (provisions were increased by approximately twenty-nine percent) and an increase in non-performing assets. Further, due to reported losses, defendant Dalhouse declared that "Dominion's board had undertaken new, specific efforts to try to get its credit policies and procedures under control."

Plaintiffs contend if Dominion's loan portfolio was well-balanced and if the loan loss reserves were reviewed on a quarterly basis as defendants previously reported, then Dominion would not have suffered significant losses and would not need to undertake new efforts to assure its credit policies and procedures were under control. Further, plaintiffs assert defendants did not tell the entire truth in May, 1990 when they announced an increase in non-performing assets because the Bank claimed the increase was due to a weakening real estate market and changes in the Comptroller of the Currency's examination approach.

In sum, plaintiffs allege that due to the significant losses announced between April

---

**6.** Moody's lowered Dominion's debt ratings on September 26, 1990.

**7.** Between January 18, 1989 and July 18, 1990, Dominion stock traded as high as $26⅛ per share and fell as low as $12⅛ per share.

and July 1990, the defendants must have known or should have known of prospective losses from January 1989 to July 1990 when the Bank distributed optimistic reports. If defendants knew of the losses, yet misrepresented the Bank's condition, then defendants violated Rule 10(b)(5) of the Securities Exchange Commission.

In light of decisions holding that mismanagement is not actionable under Rule 10(b), plaintiffs argue they do not allege that defendants mismanaged Dominion's lending activities, but that defendants lied to potential investors about the deteriorating condition of Dominion Bank. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). The Court accepts the manner in which plaintiffs frame their claim in considering defendants' motion to dismiss pursuant to Rule 9(b).

Accepting plaintiffs' assertion that they do not allege mismanagement and instead allege fraud, the Court holds that plaintiffs fail to state claims which would allow the Court to infer defendants knew the statements were deceitful, defendants should have known the statements were deceitful, or even that the statements were deceitful. Although plaintiffs do not have to plead their evidence, they do have to do more than contrast quarterly and yearly statements presented over a two year period. "[B]ecause only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)[8]. Virtually all plaintiffs' claims describe the substance of a public document published by Dominion and make the bald assertion that the documents "made untrue statements of material facts and omitted to state material facts necessary in order to make the statement made ... not misleading." Plaintiffs do not state how the statements are mis-

leading. That is, plaintiffs do not state how defendants knew the loan loss reserves were inadequate, or how defendants ignored the increase in non-performing assets.

In *DiLeo v. Ernst & Young*, the Seventh Circuit reviewed a district court decision dismissing a securities claim under Rule 9(b). Plaintiffs, the DiLeos, claimed that Ernst & Whinney (now Ernst & Young), the accountants of a failing Illinois bank, certified fraudulent financial statements that were incorporated into SEC forms, thus violating securities laws. Citing facts similar to those cited in this case, the DiLeos complained the bank did not increase its reserves to meet loan losses incurred though defendants knew they could not collect many of the loans. The Seventh Circuit held the complaint did not plead fraud with particularity as required under Rule 9(b) in part because one "cannot tell from reading [the complaint] why the DiLeos believe that the problems were so apparent that reserves should have been jacked up before the end of 1983—why failure to increase the reserves amounted to fraud." *Id.* at 627. Likewise, this Court can not glean from plaintiffs' complaint why plaintiffs believe defendants must have known the reserves were inadequate. "Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how...." *Id.* at 627. The plaintiffs in the instant case fail to plead the "how." How did defendants know the loan loss reserves were inadequate? How did defendants know certain accounts were not to be collected? Plaintiffs repeatedly make bold assertions of misrepresentations and omitted facts—but do not claim facts to explain why the statements are misrepresentations. Why were the statements false when made, and how were defendants to know? In hindsight, the reserves were not adequate, but this is not necessarily fraud. Indeed, this does not even imply fraud.

---

**8.** Citing *Goldberg v. Household Bank, f.s.b.*, 890 F.2d 965 (7th Cir.1989); *First Interstate Bank v. Chapman & Cutler*, 837 F.2d 775, 780 (7th Cir. 1988); *Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978).

In sum, plaintiffs fail to plead facts which would imply fraud, nor do they give any indication that they could prove scienter. Although intent need not be alleged with the same particularity as other elements of fraud, the complaint must allege facts "which give rise to a strong inference that the defendants possessed the requisite fraudulent intent." *Cosmas*, 886 F.2d at 12.

In addition, the Court is concerned by the fact that the complaint filed in the instant suit is nearly identical to complaints filed in *Haft v. Eastland Financial Corp.*, 755 F.Supp. 1123 (D.R.I.1991), *Gollomp v. MNC Financial, Inc. et al.*, 756 F.Supp. 228 (D.Md.1991), and *Akerman v. Bankworcester Corporation, et al.*, 751 F.Supp. 11 (D.Mass.1990). The fact that the complaint in the instant case is nearly identical to those of the above-noted cases raises a suspicion in the Court's mind that the present suit is being forwarded for its set-tlement value. Defendants particularly note the similarity between the instant case and *Gollomp*. In *Gollomp*, the plaintiffs claimed defendants failure to increase loan loss reserves did not merely constitute poor banking judgment, but was so lacking in factual basis that it necessarily resulted either from a deliberate intent to defraud or a reckless disregard for the truth. The district court dismissed the suit noting that the complaint did not "identify the facts which plaintiffs allege demonstrate fraud as opposed to mere mismanagement or faulty economic prognostication." Plaintiffs in the instant suit claim their complaint differs from that presented and dismissed in *Gollomp* because plaintiffs state "the exact omissions of material fact" of which defendants are accused. In support of this claim, plaintiffs point to paragraphs 38 and 39(a)–(h) of their complaint.[9]

While plaintiffs point to these paragraphs as the paragraphs that most specifi-

---

**9.** Plaintiffs claim:

(a) that the Corporation's earnings, assets and net worth were materially overstated and inflated throughout the Class Period due to, *inter alia*, grossly inadequate provisions for loan loss reserves;

(b) that the Corporation, throughout the Class Period, understated nonperforming loans and failed to provide adequate loan loss reserves for problem loans promptly and properly;

(c) that contrary to the reportedly strong quarterly and annual financial results in the face of the declining real estate market, increasing nonperforming assets would require significant additions to loan loss reserves, resulting in substantial losses to the Corporation;

(d) that in its efforts to expand its business and to inflate its reported earnings, Dominion had overconcentrated its loan portfolio in the real estate sector of the economy, thus exposing Dominion to serious risk of material losses, only a small percentage of which had been written off or reflected adequately in its loan loss reserves, or classified as nonperforming loans;

(e) that, contrary to the statements contained in Dominion's group-published Forms 10–Q and Forms 10–K throughout the Class Period, that its provision for loan losses was "adequate to provide for potential loan losses," its total loan loss reserves were in fact not maintained at an adequate level in light of the prevailing economic conditions and the concomitant high risk of noncollectibility of a significant portion of Dominion's loans;

(f) that, contrary to the statements contained in Dominion's public disseminations, including its 1989 Annual Report, that its credit standards were set deliberately high to protect Dominion from serious loss, Dominion's credit review and authorization standards and policies and systems of internal controls were in fact not functioning adequately and were being disregarded by senior officers of the Corporation in order to maintain artificially high fees, loan and earnings growth;

(g) that, contrary to the statements made in Dominion's public disseminations that its lending practices and controls were being continually monitored and that the Company engaged in safe, prudent lending, and that … "Dominion substantially reduces potential credit risk and losses", the Corporation's lending practices and controls had in fact become increasingly unmanageable and its commercial lending officers were engaging in high-risk and speculative loan and/or refinancing transactions which were not being adequately supervised, controlled, or directed by the Corporation's Board of Directors or management, including the Individual Defendants; and

(h) that, contrary to the statement made in Dominion's public disseminations, including its 1989 Annual Report … that the Corporation's management and loan officers were vigilant and cautious in supervising and controlling its lending activities and especially its real estate lending activities, the Corporation's management was in fact inadequate to supervise and properly control the lending activities in which the Corporation had engaged, particularly those in the real estate sector.

cally state their claims, the Court disagrees that the paragraphs are specific at all. In essence, plaintiffs claim the defendants maintained grossly inadequate loan loss reserves; the defendants understated non-performing loans; the defendants overconcentrated the loan portfolio in the real estate sector; the Corporation's credit review and authorization standards and policies were not functioning properly; and the Corporation's lending practices and controls had become unmanageable. To support these claims, plaintiffs merely quote defendants' representations from January 1989 to July 1990 and then state that the inverse was true. Plaintiffs fail to provide any separate facts in support of their claims.

Given the absence of facts provided in plaintiffs' complaint, the Court refuses to infer that defendants purposefully misrepresented the Bank's condition from January 18, 1989 to July 1990. The Court will not speculate that defendants defrauded these investors just because Dominion suffered more losses than predicted. Dominion's officers and directors may well have thought the Bank had adequate provisions for loan loss reserves and the loan portfolio was well balanced. The Court does not know that the condition of Dominion Bank did not deteriorate rapidly between April 1990, when the first negative public disclosure was made and July 18, 1990, the date which plaintiffs have pinpointed as the final date at issue in this suit (the end of the proposed "class period"). Indeed, many financial institutions have experienced significant losses within the last two years.

## 12(b)(6) ANALYSIS

 "Absent some form of deception, allegations that a defendant failed to disclose mismanagement are not sufficient to state a cause of action for securities fraud." *Naye v. Boyd*, [1986–1987 Transfer Binder] Fed.Sec.L.Rep. (CCH) 92,979 at p. 94,808, 1986 WL 198 (W.D.Wash.1986) (citing *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir.1978)). Because plaintiffs fail to allege fraud adequately, the Court reads plaintiffs' claims as alleging mismanagement.

For, in claiming that the Corporation's lending practices and control had become increasingly unmanageable, that Dominion had overconcentrated its loan portfolio in the real estate sector of the economy, and that the Corporation failed to provide adequate loan loss reserves, plaintiffs claim only corporate mismanagement. The errors to which plaintiffs point are actually judgment calls made by the Bank officials.

Plaintiffs cannot allege mismanagement in a class action under Rule 10(b), but must bring a derivative suit under state law. *See Naye v. Boyd*, 92,979 at p. 94,809. Thus, in the alternative, this suit must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## CONCLUSION

The Court recognizes plaintiffs' assertion that Dominion holds the information necessary to establish plaintiffs' claims, and that no mere shareholder would have access to the internal records and loan files that might demonstrate defendants' knowledge or reckless disregard of Dominion's precarious financial condition prior to July, 1990. Yet, plaintiffs cannot proceed on a claim that the defendants fraudulently misrepresented the Bank's economic status where that claim is based on the inference that, given defendants' May and July 1990 reports that the Bank experienced a dramatic increase in nonperforming loans and a decrease in earnings, defendants were lying when they reported record earnings and claimed to have a well-balanced loan portfolio in 1989. The Complaint is devoid of any basis from which one could infer fraud; the Court cannot allow plaintiffs to conduct discovery pursuant to a vague allegation of fraud. The Court must dismiss this complaint because plaintiffs do not plead fraud particularly so as to assure the Court that plaintiffs are not bringing a strike suit.[10]

---

10. Plaintiffs also rely on *Howard v. Haddad,* 916 F.2d 167 (4th Cir.1990) in claiming their com-

plaints are adequate to survive a motion to dismiss under Rule 9(b). However, *Haddad* is inapposite to the instant case as the Fourth Circuit did not address the sufficiency of plaintiff's claim under Rule 9(b), but considered whether Haddad's claims were derivative of claims forwarded by the intervenor, the Federal Deposit Insurance Corporation.